# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-CR-30103-MJR |
| | ) | |
| JAMES T. WENDT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**REAGAN, District Judge:**

## I. Introduction

In August 2004, James Wendt was indicted for possession with intent to distribute cocaine, in violation of **21 U.S.C. § 841**.[1]  At his arraignment, Wendt was released on bond, and trial was set for October 25, 2004.  Wendt successfully moved to continue both the deadline for filing a suppression motion and the trial date (the latter was continued to December 13, 2004).

On October 25, 2004, Wendt filed a motion to suppress evidence and quash arrest (Doc. 25) and memorandum in support (Doc. 26).  In the wake of several continuances, that motion was set for hearing February 18, 2005, with trial to commence the following month.  The United States of America ("the Government") responded to Wendt's motion on January 29, 2005 (Doc. 43).

Ten days later, Wendt moved to supplement his suppression motion, actually seeking to reverse his position on the question of whether probable cause supported his traffic stop.  Wendt

---

[1] A second count of the indictment seeks to forfeit all property/proceeds of the alleged criminal activity, including $1814.00 in U.S. currency and a 1999 Ford Expedition.

claimed that the receipt of certain "newly discovered evidence" caused him to withdraw his earlier concession that probable cause existed for the traffic stop/seizure.

The Court permitted the "supplementation," with the understanding that Wendt would promptly produce to the Government whatever newly discovered evidence triggered the change in positions. *See* Doc. 55.[2]   On February 17, 2005, defense counsel obtained another continuance, which resulted in the suppression hearing being moved to February 25, 2005.

At the February 25th hearing, defense counsel (complaining of having just received certain tape recordings requested just one week earlier) orally moved to continue the suppression hearing and trial yet again.  Over the Government's objection, the Court granted Wendt's oral motions, continued the suppression hearing to June 6, 2005, and continued trial to June 7, 2005.

Wendt moves to quash his arrest and suppress all evidence discovered (and statements made) during a July 2004 traffic stop and search of his vehicle.  A hearing was held on the suppression motion on  June 6 and June 7, 2005 and the parties were permitted to submit written closing arguments.  Having heard the evidence and reviewed the various legal memoranda, the Court finds that the evidence establishes the following.

## II.  Analysis of Motion to Suppress Evidence and Quash Arrest

On July 22, 2004, members of the Metropolitan Enforcement Group of Southwestern Illinois ("MEGSI") and the Collinsville, Illinois Police Department placed signs on the shoulder of

---

[2]      On June 1, 2005, the Government moved to compel Wendt's attorneys to produce the "newly discovered evidence" in question.  At a June 3, 2005 hearing on that motion, defense counsel clarified what they had referred to as newly discovered evidence (already-produced evidence relating to written warnings/stop cards issued July 22, 2004) and stated that they had no other such evidence to produce to the Government.

the eastbound lanes of Interstate 55/70 about a half-mile west of Exit 9 (the "Black Lane" exit).  The signs stated that a drug checkpoint lay one mile ahead.  Decoy police cruisers (which actually contained no officers) were positioned down the highway with their lights activated.  The officers and agents positioned themselves off the interstate, down Exit 9 near the intersection of Fairway Drive and Black Lane/Fairmont Avenue.

Just before 3:00 p.m., MEGSI Agent Michael Parkinson (using binoculars, sitting in his Jeep Cherokee, and acting as a "spotter" observing the eastbound lanes of 55/70) radioed the officers that he had seen a white Ford Expedition cross two lanes of traffic without using a turn signal and exit the interstate without using a turn signal.

As the Expedition drove onto the exit ramp for Black Lane, MEGSI Agent Jon Brett Boerm saw the vehicle straddling the center line of the roadway.  Agent Boerm initiated a stop at the intersection of Fairmont Avenue and Fairway Drive.  The vehicle had Missouri license plates.

Boerm approached the driver of the Expedition, explained the reason for the traffic stop, and asked for the driver's license.  Defendant James Wendt provided a Missouri driver's license.  Wendt's hands were visibly trembling as he handed over the license.  Boerm asked where Wendt resided.  Wendt did not make eye contact.  He responded in a shaky voice that he was living in Springfield, Missouri.  Wendt then volunteered that he was traveling to Green Bay, Wisconsin.  Through the open driver's side window of the Expedition, Boerm saw what looked like a license plate sticking out from the passenger floor mat.

While this exchange was taking place, Collinsville Police Officer Charles Mackin approached the rear driver's side of Wendt's vehicle and noticed fresh black paint on the rear wheel

well. This aroused Mackin's suspicion, because his training in drug interdiction had taught him that fresh paint "overspray" can be indicative of a secret compartment in a vehicle.[3]

      Agent Boerm returned to his own car where he radioed central dispatch at the Collinsville Police Department. The dispatcher ran Wendt's driver's license and reported to Boerm that Wendt's license was valid in Missouri and surrendered in Wisconsin.

      While Boerm was waiting for this information from dispatch, Mackin had taken Boerm's position at the driver's side window of Wendt's Expedition. Mackin asked if he could talk to Wendt. Wendt said yes. Mackin asked: "Where are you going?" Wendt said to Green Bay. Mackin asked Wendt: "Why would you get off the highway here?" Wendt responded: "To get gas." Mackin looked down and noticed that Wendt had between one-quarter and one-half a tank of gas. Mackin found Wendt's answer unusual, because the stretch of highway which Wendt had just left contained no signs indicating that there was a gas station at this exit. Mackin also found it odd that Wendt would not look at him while talking to him. Instead, Wendt stared straight ahead.

      Boerm returned to the Expedition, and Mackin stepped back, positioning himself at the rear driver's corner of the vehicle, to provide "cover" or officer safety for Agent Boerm. Boerm again asked Wendt where he currently lived.

      This time, Wendt said he lived in Green Bay, Wisconsin and was headed there. Agent Boerm asked where Wendt had departed from. Wendt said he had left Springfield, Missouri the day before (July 21st). This response struck Agent Boerm as curious, since Springfield was only a 4-hour drive from the location of the traffic stop.

      Wendt was becoming increasingly nervous while answering these simple questions.

---

[3]    In the suppression hearing, the Court learned that under **625 ILCS 5/12-612**, it is a violation of Illinois law to own or operate a vehicle with a secret compartment.

Boerm then asked Wendt why he had exited the highway.  Wendt said to get gasoline.  Boerm asked where Wendt planned to get gas.  Wendt responded that he "didn't know, he hadn't seen any signs."

[Wendt, who testified on day two of the suppression hearing, conceded that he had seen no signs for a gasoline station at the Black Lane exit.  Ultimately, he admitted that the statement about looking for a gas station was not truthful.  Indeed, Wendt explained that he exited the interstate because he "didn't want to deal with the police."  Wendt even admitted that he knew or believed there were drugs in his Expedition.]

Boerm asked Wendt to step out of the vehicle.  Wendt did so.  Boerm gave Wendt back his license and stated that Wendt's nervous behavior and conflicting answers about where he lived made Boerm believe that Wendt was not being truthful.  Boerm asked Wendt if he had anything illegal in his vehicle, such as guns, drugs, or contraband.  Wendt said no.  Boerm asked if Wendt would consent to having his vehicle searched.  Wendt shrugged his shoulders and agreed.

Wendt expressed no reluctance in consenting.  Wendt neither asked questions nor hesitated before consenting.  Officer Mackin, who overheard this portion of Wendt and Boerm's exchange (which occurred after Wendt had stepped out of the Expedition), saw and heard no reluctance when Wendt orally consented to the search.

Boerm got in the front seat of the Expedition.  He found United States currency, in five dollar denominations, in several spots throughout the passenger compartment, including in the console and under the visor.  He examined a license plate that was protruding from the passenger-side floor mat, which was lying face-up under the mat with a second license plate from Wisconsin and a temporary registration form.  Agent Boerm then got in the second row of seats of the Expedition.  He looked in a medium-sized duffel bag and saw several changes of clothing, some

toiletries, and a receipt.  The receipt was from a Drury Inn in Dallas, Texas and displayed Wendt's name.  Interestingly, the receipt had a check-in date of July 21, 2004 and a check-out date of July 22, 2004.  This was inconsistent with the itinerary information Wendt had provided.  Additionally, Boerm had learned in his drug interdiction training that Texas is a "source state" for narcotics.

Boerm questioned Wendt about his travel path.  Wendt said he had left Springfield, Missouri on July 21st and was driving to Green Bay, Wisconsin.   Boerm asked Wendt how that could be true if he just left a Dallas, Texas hotel that same day (July 22, the day of the traffic stop).

Meanwhile, Officer Mackin (assisted by a sheriff's deputy trainee named Hank Ritter) looked under Wendt's vehicle and saw what appeared to be a false compartment, directly under the rear seat (there was an outline of a square that appeared to have been welded to the vehicle, and that area was covered in fresh black spray paint).  Boerm saw this too.

Boerm re-approached Wendt and told him that they suspected his vehicle contained a false compartment.  Wendt denied any knowledge of such a compartment and said he had just purchased the vehicle the previous week.  Boerm then asked if Wendt would let the officers more thoroughly inspect the vehicle at a nearby Amoco station/garage.  Wendt said yes. [At the suppression hearing, Wendt testified that he did not ask to leave at this point in the traffic stop, did not object in any way to himself being taken to the Amoco station, and expressed no reluctance to the officers moving his vehicle to the Amoco for further inspection.]

Boerm explained that Wendt would be detained pending further investigation of the vehicle.  Agent Boerm drove Wendt's Expedition to the Amoco station in Collinsville.  In accord with police department policy, Wendt was handcuffed (for officer safety) while being transported by Collinsville Police Officers to the Amoco station.  The officers began transporting Wendt to the

Amoco station at 3:18 p.m., roughly 20 minutes after the traffic stop had begun.

When they reached the BP/Amoco station on Highway 157 in Collinsville, the officers un-cuffed Wendt. Agent Boerm asked Agent Parkinson for a pre-printed MEGSI search waiver form, which Parkinson provided. Boerm and Parkinson presented the waiver form to Wendt, who was not handcuffed and was then out of the squad car. Wendt signed it, without question or hesitation, around 3:30 p.m.

Only after the form was signed did the officers/agents further inspect the vehicle, turning their attention to the false compartment. When the rear seat was removed and the carpet pulled back, the officers immediately saw a hidden trap door secured by a single bolt. Inside the compartment the officers found 17 individually-wrapped bundles of cocaine. A total of $1814.00 in U.S. currency was found in the car.

Records of radio transmissions establish that the cocaine was discovered at approximately 3:35 p.m. Wendt was arrested, handcuffed, and advised of his *Miranda* rights. He was driven to the Collinsville Police Department, where he was booked at 4:30 p.m.

Moving to quash his arrest and suppress all evidence/statements made during the search, Wendt argues that, after requesting his license and asking where he was residing, Agent Boerm improperly continued to ask questions and "investigate other crimes which were independent of the original reason for the stop" (*i.e.*, asking if Wendt had anything illegal in the vehicle). Citing ***Terry v. Ohio*, 392 U.S. 1 (1968),** Wendt argues that Boerm lacked "reasonable articulable suspicion" to probe into possible drug or gun violations.

Under ***Terry*,** "police officers may conduct a brief, investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been

committed." ***United States v. Johnson***, 383 F.3d 538, 542 (7th Cir. 2004). Reasonable suspicion means an "objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." ***Id.***

Here, defense counsel maintain that, by investigating matters beyond the subject of the traffic stop, Agent Boerm ran afoul of the rule in ***Terry***. In a recent *dissenting* opinion, Justice Souter tendered a similar argument. ***See Illinois v. Caballes***, – U.S. –, 125 S. Ct. 834, 839 n.1 (2005). The stop at issue here, however, is not properly analyzed under ***Terry***. Rather, this traffic stop was justified by probable cause.

According to the testifying police officers, Wendt committed three separate traffic violations:1) he changed lanes without using his turn signal; 2) he exited the highway without using a signal; and 3) he straddled the center line of the road. One officer observed the first two violations while a second officer observed the third. Clearly, a police officer who has probable cause to believe that a driver has committed a traffic infraction – even a minor one– may initiate a traffic stop, and the officer's subjective motivations for making the stop are irrelevant. ***See Wren v. United States,*** 517 U.S. 806, 813 (1996); ***United States v. Brown,*** 188 F.3d 860, 864 (7th Cir. 1999); ***United States v. Williams***, 106 F.3d 1362, 1365-66 (7th Cir. 1997).

In ***United States v. Bass***, 325 F.3d 847, 850 (7th Cir.), ***cert. denied,*** 540 U.S. 998 (2003), the Seventh Circuit reiterated:

> As a general matter, a police officer's decision to stop a car is reasonable if the officer has reason to believe a traffic violation has occurred.... Any ulterior motive an officer may have for making the stop is irrelevant.... [***quoting Wren***, 517 U.S. at 813] "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."

Without question, Agent Boerm properly stopped Wendt's vehicle. Wendt had

committed a traffic violation, and the stop was supported by probable cause.  The request for the

driver's license likewise was proper.  "This is reasonable in any traffic stop supported by probable

cause." ***United States v. Jackson*, 377 F.3d 715, 717 (7th Cir.), *cert. denied*, 125 S. Ct. 649 (2004).**

        Defense counsel challenge the questions which went beyond Wendt's identity,

driver's license, and current residence.  In the brief supporting suppression (Doc. 26), defense

counsel argue: "Even having declared his intention of giving Mr. Wendt a warning, Agent Boerm

still did not issue a warning, and instead began asking questions and investigating other crimes

which were independent of the original reason for the stop."[4]  Defense counsel maintains that these

questions transformed an arguably proper initial detention into an illegal "seizure" of Wendt.

        The Seventh Circuit rejected just such an argument in ***United States v. Childs*, 277**

**F.3d 947, 949 (7th Cir.), *cert. denied*, 537 U.S. 829 (2002),** concluding: **"**The full court holds that,

because questions are neither searches nor seizures, police need not demonstrate justification for

each inquiry."  The Court added:

> Because probable cause supported this stop, neither the driver nor
> [the Defendant] had a right to be released the instant the steps to
> check license, registration, and outstanding warrants, and to write a
> ticket, had been completed.

***Childs*, 277 F.3d at 953.**  Additionally, the Seventh Circuit clarified that questions asked of persons

involved in traffic stops "are not seizures and thus do not require probable cause or reasonable

---

[4]    At trial and in his briefs, Wendt makes much ado about inconsistences surrounding the time listed on the
Stop Card and Written Warning (*i.e.* the warning citation issued by Officer Boerm for one of the traffic
violations) issued, as well as details on the document itself  (it was not signed by Wendt; was not part of his
inventoried personal effects; was initially written with an offense time of 11:40 a.m. and later changed to
15:40.) While these shortcomings may affect the credibility of the Government's case, they are unimportant
to the issue of whether probable cause existed for the vehicle stop in the first instance.  Probable cause can
exist whether a valid ticket, citation or warning is issued or not. The failure to issue a ticket is often fodder
for cross-examination in suppression hearings, and as a result, tickets are often issued to avert the claim that
there could be no violation if there was no ticket written. But the lack of a ticket does not equate to lack of
probable cause just as the existence of a ticket does not automatically equate to valid probable cause.

suspicion." ***Childs*, 277 F.3d at 951.**

        The Court's analysis does not end here, though.  If a driver is placed in custody via a traffic stop, the nature and duration of that custody must be reasonable under the Fourth Amendment to the United States Constitution.  The Court must ascertain whether the questioning rendered the physical detention unreasonable.  ***Childs*, 277 F.3d at 952.**

        In the case at bar, the questions were legitimate, and the detention was reasonable. As the Seventh Circuit declared in ***Childs*, 277 F.3d at 954***:*

> Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public – for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

        ***Ohio v. Robinette*, 519 U.S. 33, 36-37 (1996),** is instructive as to the questions which may be asked during a traffic stop.  In ***Robinette***, a deputy sheriff stopped a motorist for speeding. After performing the necessary administrative tasks and returning the motorist's license, the deputy asked the motorist if he had any drugs or contraband in the car.  That question prolonged the custody.  The motorist said no, after which the deputy asked if he could search the car.  The motorist consented, marijuana was discovered, and the motorist unsuccessfully tried to suppress.

        The Ohio Supreme Court held that the questioning was unconstitutional, and the officer could not raise matters unrelated to the original purpose of the traffic stop until he told the driver he was free to go.  The United States Supreme Court reversed, finding the detention lawful and reasonable.  The high Court also upheld the deputy's directive for the motorist to exit his car:

> there is no question that, in light of the admitted probable cause to stop Robinette for speeding, Deputy Newsome was objectively

justified in asking Robinette to get out of the car, subjective thoughts notwithstanding. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 ... (1977) ("once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures").

Similarly, by asking a motorist about drugs, the officer in ***Childs*** did not transform the motorist's custody into an unreasonable seizure:

What happened here must occur thousands of times daily across the nation. Officers ask persons stopped for traffic offenses whether they are committing any other crimes. That is not an unreasonable law-enforcement strategy, either in a given case or in gross; persons who do not like the question can decline to answer. Unlike many other methods of enforcing the criminal law, this respects everyone's privacy.

***Childs*, 277 F.3d at 954.**

In the instant case, because there existed a proper traffic stop, Wendt could be questioned by Agent Boerm without the questions constituting a "seizure" under the Fourth Amendment. Moreover, assuming *arguendo* that Boerm's questions constituted a seizure, reasonable suspicion of criminal activity justified the questions. ***See United States v. Moore*, 375 F.3d 580, 583-84 (7th Cir. 2004).**

Agent Boerm plainly observed nervous behavior by Wendt (*i.e.* Wendt's shaking hands when furnishing the driver's license, Wendt avoiding eye contact when answering questions).[5] Wendt also gave inconsistent answers to a simple straightforward question about where he lived and claimed he needed gas (which he admitted in court was untrue) while the officer could see his fuel

---

[5]     The Court looks upon this "nervousness in support of probable cause testimony" with a jaundiced eye since Wendt's nervous behavior can be reasonably explained by the fact that most people stopped by the police have a natural tendency to be nervous. More credible in support of the claimed probable cause are the answers to on-scene officer questioning (*i.e.*, address of Wendt and purpose of exiting interstate to obtain gas) which Wendt, at the hearing, admitted were untrue.

gauge was between a fourth to a half full.  Nervous or evasive behavior is a "pertinent factor" in determining whether reasonable suspicion existed.  *See Illinois v. Wardlow*, **528 U.S. 119, 124 (2000).**  And inconsistent statements can give rise to a reasonable suspicion that a suspect was involved in criminal activity. *See United States v. Sholola*, **124 F.3d 803, 808 (7ᵗʰ Cir. 1997).**

The traffic stop, the request for the driver's license, the initial questions, and the additional questions do not offend the Fourth Amendment.  Neither does the consensual search of Wendt's Expedition or his subsequent arrest.

Wendt orally consented at the site of the traffic stop and executed a written consent at the BP/Amoco station.  The evidence in the record indicates that both these consents were wholly voluntary and were not the product of any coercion, duress, or overreaching.  *See United States v. Celitti,* **387 F.3d 618, 622 (7ᵗʰ Cir. 2004)(listing factors to be considered in determining voluntariness of consent to search);** *Schneckloth v. Bustamonte*, **412 U.S. 218, 222 (1973);** *United States v. Raibley*, **243 F.3d 1069, 1075-76 (7ᵗʰ Cir.),** *cert. denied*, **534 U.S. 876 (2001).[6]**

### III.  Conclusion

For all these reasons, the Court **DENIES** Defendant Wendt's motion to quash arrest and suppress evidence (Doc. 25).

If Defendant Wendt elects to go to trial, a final pretrial conference will be held 1:00 p.m. on June 17, 2005. Trial will proceed at 9:00 a.m. on June 27, 2005.  If Defendant elects to pursue a conditional plea, that plea will be taken at 1:00 p.m. on June 17, 2005 in lieu of the final

---

[6]  The Court also finds merit in the Government's argument that Officer Mackin discovered the fresh black spray paint in the rear wheel well (observed from a lawful vantage point at the outset of the traffic stop) without effecting *any* search or seizure.

pretrial conference.

**IT IS SO ORDERED.**

**DATED this 10th day of June, 2005.**

**s/ Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Court**